**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MALIK R. MAWALIN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 11 C 1627** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Malik R. Mawalin seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. 42 U.S.C. § 1381a. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and filed cross-motions for summary judgment. After careful review of the record, the Court now grants Defendant's motion and denies Plaintiff's motion.

## PROCEDURAL HISTORY

Plaintiff applied for SSI on July 30, 2007, alleging that he became disabled on January 1, 1999 from asthma, depression and neuropathy. (R. 184, 204-05). The Social Security Administration ("SSA") denied the application initially on November 16, 2007, and again on reconsideration on June 16, 2008. (R. 86-99). Pursuant to Plaintiff's timely request, Administrative Law Judge Michael G. Logan (the "ALJ") held a hearing on May 4, 2010. The ALJ heard testimony from Plaintiff, who appeared with counsel, as well as from medical experts Ashok G. Jilhewar, M.D. and Larry M. Kravitz, PhD., and vocational expert

Melissa Benjamin.  Shortly thereafter, on August 27, 2010, the ALJ found that Plaintiff is not disabled because he can perform a full range of work at all exertional levels as long as he: (1) avoids even moderate exposure to fumes, odors, dusts, gases, poor ventilation, and extreme heat and cold; and (2) has only minimal contact with superiors, co-workers, and the public.  (R. 11-28).  The Appeals Council denied Plaintiff's request for review on February 23, 2011, and Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.  (R. 1-3).

In support of his request for a remand, Plaintiff argues that the ALJ failed to consider evidence indicating that his asthma is severe enough to meet Listing 3.03B.  Plaintiff also alleges no fewer than four errors in the ALJ's residual functional capacity ("RFC") determination.  As discussed below, the Court finds that the ALJ's decision is supported by substantial evidence and need not be remanded.

## FACTUAL BACKGROUND

Plaintiff was born on January 5, 1955, and was 55 years old at the time of the ALJ's decision.  (R. 184).  He has an associate's degree and lives on the second floor of his mother's two-flat.  (R. 41, 64, 209).  His past work includes car salesman and limousine driver, but he has not been employed since approximately 2003.  (R. 55-57).

**A.    Medical History**

**1.    2002 through 2005**

Plaintiff first sought medical treatment for back pain on August 19, 2002 when he presented to the University of Chicago Medical Center complaining of what he described as "sciatica."  (R. 533).  An MRI of the lumbar spine showed mild-to-moderate degenerative

disc disease of the lower lumbar spine, but no evidence of spinal or foraminal compromise. (R. 529). Plaintiff received a referral for physical therapy and a prescription for Relafen to help with pain relief. (R. 534). A Physical Therapy Progress Note from August 26, 2002 reflects that Plaintiff appeared for an initial evaluation but failed to follow up with further treatment. (R. 427, 581-89).

More than a year later, on December 24, 2003, Plaintiff went to the University of Chicago Hospitals emergency room ("Chicago ER") complaining of shortness of breath lasting three weeks. (R. 573). He was treated with Albuterol, Atrovent and Prednisone, and discharged in good condition. (R. 571). Plaintiff's next acute asthma exacerbation occurred a year and a half later on June 21, 2005. Doctors from the Little Company of Mary Hospital emergency room noted that Plaintiff had run out of his Albuterol and Flovent inhalers at that time, and they administered two nebulizer treatments. (R. 594, 602). Plaintiff received prescriptions for both of his inhalers plus a four-day course of Prednisone, and was discharged in stable condition. (R. 602).

Two weeks later, on July 5, 2005, Plaintiff went to the Chicago ER due to an asthma attack and wheezing that was not alleviated at home with medication. (R. 559, 563). A chest X-ray showed "some mild flattening of the diaphragm suggesting underlying obstructive lung disease," but was otherwise normal. (R. 275, 527). The doctor administered Albuterol and Prednisone and diagnosed Plaintiff with asthma exacerbation. (R. 559). Later that month, on July 26, 2005, Plaintiff went back to the Chicago ER complaining of lower back pain lasting one week. (R. 546). He told the doctor that the pain felt like kidney stones, but a urinalysis was negative. (R. 550, 555). Plaintiff responded

well to Tylenol and was discharged the same day in good condition without any prescriptions.  (R. 555).

### 2.    2006

Plaintiff next sought emergency treatment on March 17, 2006 when he went to the Holy Cross Hospital emergency room ("Holy Cross ER") with a moderate asthma attack. He was "out of meds" at the time, and doctors admitted him with a diagnosis of asthma and renal insufficiency.  (R. 492-93).  A chest X-ray taken the next day showed "[a]n apparent diffuse emphysema compatible with hyperinflation of the lungs, asthma, or COPD."  (R. 497).  Plaintiff was discharged in stable condition with a final diagnosis of exacerbation of asthma, back pain and opiates abuse.  (R. 490, 500).

Late on the evening of May 22, 2006, paramedics took Plaintiff to the Holy Cross ER, where he presented with severe shortness of breath and generalized wheezing.  The doctor admitted him due to acute bronchial asthma, but a chest X-ray taken that day showed no changes from the March 17, 2006 findings.  (R. 502-03, 505, 507).  A May 23, 2006 echocardiogram was similarly unremarkable.  (R. 508-09).  Plaintiff was finally discharged on the morning of May 24, 2006.  (R. 510).

On November 28, 2006, Plaintiff went to the Provident Hospital emergency room ("Provident ER") due to shortness of breath and a cough.  (R. 289).  He was in moderate distress and exhibited rhonchi and wheezes.  (*Id.*).  The doctor diagnosed asthmatic bronchitis, instructed Plaintiff to increase his oral fluids, and gave him prescriptions for Albuterol, Advair, Singulair and Prednisone.  At the time of his discharge, Plaintiff felt "better" and had been resting comfortably.  (R. 288).

4

### 3. 2007

Plaintiff returned to the Provident ER on March 3, 2007 complaining of shortness of breath and wheezing that did not resolve with Albuterol. (R. 286). The doctor diagnosed asthma exacerbation and bronchitis, prescribed Advair, and discharged Plaintiff in stable condition. (R. 285). A few months later, on June 10, 2007, Plaintiff went to the Holy Cross ER, again presenting with shortness of breath, wheezing and a cough. (R. 297, 299, 479, 481). The doctor diagnosed acute asthma exacerbation. (R. 298, 480). Two days later, on June 12, 2007, Plaintiff went back to the Provident ER "for asthma med[ication] refill." (R. 282-83).

Plaintiff next visited the Holy Cross ER on June 30, 2007 because of chest pain and shortness of breath. (R. 301, 311, 483). His lungs were clear at that time and his heart was normal in size. (R. 311). The doctor diagnosed acute coronary syndrome, but Plaintiff refused medical testing and signed himself out of the ER. (R. 484). One month later on July 30, 2007, the same day he first applied for benefits, Plaintiff went to the John H. Stroger, Jr. Hospital emergency room ("Stroger ER") in order to obtain refills of his medications, including Albuterol, Singulair and Gabapentin (prescribed for pain relief). He was not in acute respiratory distress, his chest was clear, and the doctor discharged him in stable condition with asthma education materials. (R. 314-19). Plaintiff returned to the Stroger ER on September 7, 2007, again seeking medication refills. (R. 332). He did not present with any shortness of breath or wheezing at that time, but he did complain of sciatica in his back and leg. (R. 330-32).

On October 16, 2007, Kenneth Gong, M.D., performed an Internal Consultative Examination of Plaintiff for the Bureau of Disability Determination Services ("DDS"). (R.

333-42). Plaintiff told Dr. Gong that he suffered from back pain that radiated down his right leg to his right foot, making the foot feel completely numb. (R. 333). He claimed that his 2003 MRI from the University of Chicago showed degenerating nerves, but confirmed that he had not received any physical therapy or injections for his condition. (R. 333-34). Plaintiff reported that his best position was sitting upright, and his worst position was lying down. He also complained of feeling depressed throughout the previous year, but stated that he had not received any related treatment. (R. 334).

Dr. Gong observed that Plaintiff "look[ed] uncomfortable" during the interview, stood the entire time, and "appeared to have severe difficulties getting up and down and maneuvering on the examination table." He was initially "pleasant enough," but then turned "somewhat hostile, passive aggressive and oppositional" when Dr. Gong started asking him about his medications. Plaintiff's effort on examination, moreover, was "suboptimal," with Dr. Gong describing him as "fairly uncooperative." (*Id.*). For example, Plaintiff "essentially refused to do the straight leg raise test," and Dr. Gong was unable to perform a strength exam because of Plaintiff's "uncooperativeness in this task." (R. 335). As a result, Dr. Gong indicated that his ability to conduct a complete physical examination was "limited." (R. 334).

Dr. Gong reported that he heard wheezing "bilaterally throughout" Plaintiff's lungs, but a spirometry report showed only mild obstruction with an FEV1 value of 2.32 and an FVC value of 3.19 before medication. (R. 335, 339). Plaintiff "appeared to have a severely antalgic gait," there was "some tenderness in the mid to lower lumbar spinous processes," and he exhibited decreased sensation throughout the right leg. (R. 335). Dr. Gong found it notable, however, that despite Plaintiff's complaints of right leg pain, his right calf muscle

6

was actually more developed than the left. (*Id.*). Dr. Gong diagnosed asthma, "[p]ain in the right leg, which [Plaintiff] described [as] sciatica," and complaints of depression. (R. 336).

Also on October 16, 2007, Robert Prescott, Ph.D., conducted a Formal Mental Status Evaluation of Plaintiff for DDS. (R. 343-48). Dr. Prescott noted that Plaintiff appeared tired, had bags under his eyes, and moved quite slowly with "a visible limp, as if he were in pain." (R. 343). Throughout the interview, Plaintiff's affect was "mostly depressed," though at times he "appeared to be somewhat angry." (*Id.*). Plaintiff reported that he had a "degenerating nerve on the right side of his body" such that he could hardly move without pain. (R. 343-44). When asked about drug and alcohol use, he admitted only to smoking marijuana "20 or 30 years ago." (R. 344). As for his daily functioning, Plaintiff told Dr. Prescott that he had a room at "a friend[']s house" and could not take a single step without being in pain. The pain made it difficult for him to dress or wash up, but he could take public transportation, do laundry and go to the store by himself. (R. 345). He also cooked sometimes and did some sweeping and mopping. Plaintiff reported that he got along well with his children and "great" with co-workers, but he felt depressed and irritable and had difficulty sleeping. (*Id.*). Dr. Prescott diagnosed "[m]ajor depression, moderate," and chronic pain due to an undisclosed medical condition. (R. 347). He noted that Plaintiff was very distant, demonstrated "strong feelings of helplessness and hopelessness," and was not capable of handling funds responsibly. (*Id.*).

The following month, on November 13, 2007, Jerrold Heinrich, Ph.D., prepared a Psychiatric Review Technique of Plaintiff for DDS. (R. 349-61). Dr. Heinrich noted that Plaintiff was not cooperative with either Dr. Gong or Dr. Prescott, and indicated that

multiple attempts to obtain relevant medical information relating to Plaintiff's mental health had all been unsuccessful. Dr. Heinrich concluded that Plaintiff's presentation before Dr. Gong and Dr. Prescott was inconsistent with the fact that he had not received any treatment for depression. As a result, Dr. Heinrich found "insufficient evidence to make a decision on this claim due to [Plaintiff's] unwillingness to cooperate." (R. 361). The next day, Richard Bilinsky, M.D., indicated that Plaintiff's claim for benefits should be denied due to failure to cooperate and insufficient medical evidence of disability. (R. 363-65).

### 4.    2008

On March 8, 2008, Plaintiff went to the Holy Cross ER complaining of low back pain radiating down his right side. (R. 373, 375). An MRI of the lumbar spine showed "minimal degenerative arthritic changes, but no other abnormality." (R. 380-81). When Plaintiff presented at the Provident ER on April 1, 2008, he said that he felt like he was going through heroin withdrawal, had been wheezing for three days, and was suffering from sciatica radiating down his right leg. (R. 388). The doctor administered asthma treatments, which resolved the wheezing and breathing problems, and diagnosed bronchitis, heroin withdrawal and asthma exacerbation. Plaintiff was released in stable condition with prescriptions for Albuterol, Prednisone and Motrin. (R. 389). Plaintiff returned to the Provident ER late in the evening on April 14, 2008 with breathing complications coupled with complaints of severe pain from sciatica. (R. 397). It appears that doctors administered an Albuterol treatment and discharged Plaintiff early the next morning. (R. 398).

On May 1, 2008, Tyrone Hollerauer, Psy.D., completed a second Psychiatric Review Technique of Plaintiff for DDS. (R. 401-13). Dr. Hollerauer found that Plaintiff had only a

mild restriction of activities of daily living, and mild difficulties maintaining social functioning, concentration, persistence, or pace.  (R. 411).  He cited to forms Plaintiff filled out for DDS on February 12, 2008, in which he reported that he was able to take care of personal needs and hygiene, prepare meals, shop, do laundry, handle money and bills, and travel independently by bus or walking.  (R. 221-30, 413).  Dr. Hollerauer confirmed Plaintiff's "varying cooperation" and lack of any history of psychological treatment or medication, and concluded that he did not have a severe impairment.  (R. 401, 413).

Plaintiff went to the Holy Cross ER on May 11, 2008 with mild shortness of breath and wheezing.  (R. 469).  A chest X-ray showed his lungs to be "clear of infiltrates, fluid and congestive changes," and there was no acute cardiopulmonary disease.  (R. 473).  The doctor discharged Plaintiff in stable condition, (R. 470), but he returned the next day with moderate shortness of breath, wheezing, coughing and rhonchi.  (R. 475).  The doctor diagnosed acute asthma and discharged him again in good condition.  (R. 476).  Later that month, on May 30, 2008, Charles Wabner, M.D., affirmed Dr. Bilinsky's November 14, 2007 denial of benefits.  (R. 415-17).

**5.    2009**

In January 2009, the Auburn Gresham Mental Health Center opened a case file on Plaintiff.  He was diagnosed with Adjustment Disorder with Mixed Anxiety Depressed Mood, but he failed to attend several scheduled counseling sessions.  As a result, his case was closed in April 2009.  (R. 634).

In the meantime, on February 12, 2009, Plaintiff went to the St. Bernard Hospital emergency room complaining that he had experienced shortness of breath and wheezing for four days, and had run out of his medications.  (R. 450, 453).  He exhibited "slight"

wheezing in both lungs and received a "breathing treatment." (R. 457). A chest X-ray showed mild obstructive lung disease with no infiltrates and no acute cardiopulmonary pathology. (R. 461). The doctor diagnosed acute asthma exacerbation and bronchitis and discharged Plaintiff in stable condition. (R. 451, 457).

In August 2009, Plaintiff developed abscesses in his right leg from shooting heroin. (R. 616, 628). An August 15, 2009 X-ray of the right tibia/fibula and right foot showed no acute bony defect, diffuse foot and ankle edema (swelling), and forefoot bony dysplasia (malformation). (R. 606). The Provident ER doctor diagnosed abscesses and cellulitis (bacterial skin infection) of the right leg, and heroin abuse. (R. 629). Plaintiff next went to the Provident ER on December 12, 2009, this time for back and left arm pain. (R. 463, 609). He received prescriptions for Naproxen and Prednisone, and the doctor instructed him to continue taking Singulair, Gabapentin, Beclomethasone (a steroid) and Albuterol. (*Id.*).

## B.    Plaintiff's Testimony

On February 12, 2008, Plaintiff completed a Function Report and Activities of Daily Living Questionnaire in connection with his application for disability benefits. Plaintiff indicated that he lived in a house with both friends and family and spent his days bathing, listening to music, eating, talking to people, moving around to keep his muscles from atrophying, resting, reading, watching television, and trying to get comfortable. (R. 221). Plaintiff said that he had trouble dressing, sitting in a tub, and using stairs due to pain, but he could prepare meals, do light laundry, go outside most days, walk and use public transportation by himself, shop for food and clothes once a month for four to six hours, pay bills, read and write. (R. 222-25). He also had "meaningful conversations" with other

10

people "most days," attended Narcotics Anonymous ("NA") meetings as often as three times per day, and considered himself to be "adaptable" and able to handle stress reasonably well.  (R. 225, 227).

Notwithstanding these activities, Plaintiff reported having severe pain, "limited locomotive ability," and "social anxiety."  (R. 226).  He stated that he could only lift up to 10 pounds and walk half a block before needing to stop and rest due to asthma and pain, and he described his quality of life as "low."  (R. 226, 228).  Plaintiff further complained that sitting in general was "agonizing" for him; standing was a little less agonizing than either sitting or walking.  He indicated that he experienced pain even when he was not moving, and described needing rest periods every hour or so when he took "a journey involving walking or shopping for food or clothes."  (R. 230).

At the May 4, 2010 hearing before the ALJ, Plaintiff testified that the pain in his back, legs and feet is at a level of seven or eight out of 10 on a daily basis, and it prevents him from sleeping.  (R. 44-45).  He takes Ibuprofen and Gabapentin, uses ice packs and heat treatments, and does minimal stretching, but still experiences pain 24 hours a day.  (R. 45-46, 58).  Plaintiff stated that some unidentified person gave him a cane to help him walk, and it took him 15 minutes to walk four or five blocks from the train to the hearing location.  (R. 67).  He also told the ALJ that he is "constantly" short of breath even though he takes asthma medication and tries to avoid respiratory irritants.  (R. 65, 67).

With respect to his mental condition, Plaintiff testified that he was robbed and beaten twice "in the last two years," making him afraid to go outside.  (R. 59-60).  He also noted that his brother physically threatened and battered him, prompting him to obtain an order of protection.  (R. 60-62).  Upon further questioning, Plaintiff admitted that the order had

11

expired, and that his brother lives directly below him on the first floor of his mother's two-flat. (R. 61, 64). Plaintiff claimed to be seeking psychological treatment at Auburn Gresham, but the medical records do not support this assertion. (R. 60).

## C. Medical Expert Testimony

Dr. Ashok Jilhewar ("ME Jilhewar") provided medical expert testimony regarding Plaintiff's physical condition. It appears that a portion of his testimony was not recorded, but he clearly stated that Plaintiff's asthma does not meet Social Security Listing 3.03. (R. 71). ME Jilhewar also noted some inconsistencies between the medical evidence and Plaintiff's testimony, including: (1) Plaintiff complained of decreased sensation in the entire right leg but there was no specific musculoskeletal disorder to account for this symptom (R. 68-69); (2) during the 2007 consultative examination with Dr. Gong, Plaintiff exhibited normal, symmetrical reflexes despite his claim that he had no sensation in the right leg (R. 69); and (3) a March 2008 spinal X-ray showed only minimal degenerative changes, and Plaintiff had no neurological deficit at that time. (R. 70). ME Jilhewar stated that if the ALJ credited Plaintiff's testimony regarding his difficulty changing positions and walking, there would be a "significant effect" on his RFC. If, however, the ALJ did not credit that testimony, then there would be "no specific limitations of the [RFC] on the low back pain." (*Id.*).

In response to questioning from Plaintiff's attorney, ME Jilhewar agreed that Plaintiff's severe antalgic gait as reported by Dr. Gong could be explained by a worsening of his back condition. He also testified, however, that although Plaintiff's condition could have worsened between the time of the 2002 MRI and the hearing date, it could have improved or completely resolved as well. (R. 72).

Dr. Larry Kravitz ("ME Kravitz") provided additional expert testimony regarding Plaintiff's mental condition. ME Kravitz stated that Plaintiff suffers from an adjustment disorder with mixed anxiety and a depressed mood, but he does not meet or equal any impairment in the Listings. (R. 73). In making this conclusion, ME Kravitz noted that there were very few psychological records available, that Plaintiff did not follow through with treatment, and that he was neither receiving treatment nor taking medication for his mental condition at the time of the hearing. (R. 73-74). ME Kravitz opined that assuming Plaintiff's statements regarding chronic pain, depression and situational stressors were credible, his only limitation would be a moderate impairment in concentration, persistence, or pace. (R. 74).

## D. Vocational Expert Testimony

Melissa Benjamin testified at the hearing as a vocational expert ("VE"). The ALJ asked her to consider a hypothetical individual of Plaintiff's age and education who: can frequently lift and carry 10 pounds; can occasionally lift and carry 20 pounds; can frequently walk and sit; can never kneel, crawl, or work at unprotected heights or with dangerous machinery; must avoid concentrated exposure to fumes, odors, dust, gases, poor ventilation, or temperature extremes; has a moderate limitation in concentration, persistence, and pace; and can have only minimal contact with co-workers and supervisors. The VE testified that such a person could work as a hand packer (approximately 7,000 jobs), assembler (approximately 2,000 jobs) or a hand sorter (approximately 3,000 jobs). (R. 77). If the same person was "off task" more than 15 percent of the workday, however, then he would not be able to engage in any competitive employment. (R. 78).

13

**E.    The ALJ's Decision**

The ALJ found that Plaintiff's bronchial asthma and adjustment disorder with anxiety are severe impairments, but they do not meet or equal any listing, including Listing 3.03B for asthma.  The ALJ characterized Plaintiff's back pain as a non-severe impairment, noting that MRI and X-ray results showed only "mild-to-moderate degenerative disc disease," "minimal degenerative arthritic changes," "no evidence of spinal or foraminal compromise," and no evidence of "disc herniation or impingement that would support [Plaintiff's] allegations of radiculopathy."  (R. 22).

After discussing the medical and testimonial evidence in detail, the ALJ concluded that Plaintiff has the RFC to perform a full range of work at all exertional levels, but he has the following nonexertional limitations: (1) he must "avoid even moderate exposure to fumes, odors, dusts, gases, poor ventilation, and extremes of heat and cold"; and (2) he can have "only minimal contact with supervisors, coworkers, and the public."  (R. 24).  The ALJ explained that the limitation on contact with others reflected the diagnosis of adjustment disorder with anxiety and depressed mood as determined by the Auburn Gresham Mental Health Center.  (R. 24).

In making this RFC determination, the ALJ found that Plaintiff's allegations of disabling pain were not fully credible.  The ALJ noted that Plaintiff variously exaggerated or understated his heroin use, and falsely told Dr. Gong and Dr. Prescott that an MRI showed he suffered from degenerating or deteriorating nerves.  Plaintiff also reported a history of employment that was not reflected in his earnings record.  (R. 26).  The ALJ assigned "great weight" to the opinions of ME Jilhewar and ME Kravitz, explaining that they provided detailed explanations supported by record citations, and he also accepted the

14

VE's testimony that Plaintiff can perform a significant number of jobs available in the Chicago Metropolitan Statistical Area. (R. 26-27). Based on all this evidence, the ALJ found that Plaintiff is not disabled within the meaning of the Social Security Act. (R. 27).

## DISCUSSION

### A.    Standard of Review

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). The court's task is to determine whether the ALJ's decision is supported by substantial evidence, which is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007) (quoting *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002)).

**B.     Five-Step Inquiry**

To recover SSI under Title XVI of the Social Security Act, a claimant must establish that he is disabled within the meaning of the Act.   42 U.S.C. § 1382c(a)(3); *Rapsin v. Astrue*, No. 10 C 318, 2011 WL 3704227, at *5 (N.D. Ill. Aug. 22, 2011).   A person is disabled if he is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."   *Id.*   In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed?  (2) Is the claimant's impairment severe?  (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?   (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work?   *See* 20 C.F.R. §§ 404.1520, 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

**C.     Analysis**

Plaintiff argues that the ALJ's decision must be reversed because he failed to consider evidence indicating that his asthma is severe enough to meet Listing 3.03B. Plaintiff also identifies four errors relating to the ALJ's RFC determination, and claims that each mandates a remand.   The Court considers the arguments in turn.

**1.     Listing 3.03B**

Plaintiff first objects to the ALJ's conclusion that his asthma does not meet or equal Listing 3.03B.   To satisfy this Listing, Plaintiff must have:

> Attacks (as defined in 3.00C), in spite of prescribed treatment and requiring physician intervention, occurring at least once every 2 months or at least six

16

times a year.  Each in-patient hospitalization for longer than 24 hours for control of asthma counts as two attacks, and an evaluation period of at least 12 consecutive months must be used to determine the frequency of attacks.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.03B.  Section 3.00C defines asthma attacks as "prolonged symptomatic episodes lasting one or more days and requiring intensive treatment, such as intravenous bronchodilator or antibiotic administration or prolonged inhalational bronchodilator therapy in a hospital, emergency room or equivalent setting." That section also requires "information documenting adherence to a prescribed regimen of treatment."  It is undisputed that Plaintiff "must satisfy all of the criteria in the Listing in order to receive an award of disability insurance benefits . . . under step three."  *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004).

The ALJ found that Plaintiff does not satisfy Listing 3.03B because there is no evidence of "asthma attacks requiring physician intervention occurring at least once every two months or six times per year despite prescribed treatment." (R. 23).  Plaintiff disagrees with this conclusion, pointing to his multiple emergency room visits between June 2005 and May 2006.  (Doc. 22, at 6).  Specifically, Plaintiff notes that he was hospitalized for more than 24 hours in both March and May 2006, which constitutes four asthma attacks, and claims that his two additional ER visits in June and July 2005 bring the total to six attacks requiring physician intervention within a 12-month period.  (Doc. 31, at 1).

Plaintiff's argument ignores the fact that he often ended up in the ER because he ran out of medication.  As the ALJ noted, when Plaintiff went to the Little Company of Mary ER on June 21, 2005, his Albuterol and Flovent inhalers were both empty.  (R. 14, 594). Plaintiff was similarly "out of meds" when he presented to the Holy Cross ER on March 17, 2006.  (R. 14, 492).  Under such circumstances, it cannot be said that either of these

17

attacks required medical intervention in spite of Plaintiff's use of prescribed treatment. *See, e.g., Huffman v. Astrue*, No. 08 C 1336, 2010 WL 685897, at *13 (C.D. Ill. Feb. 19, 2010) (ALJ fairly concluded that plaintiff's "asthma attacks requiring medical treatment did not occur *in spite of* prescribed treatment, as they often occurred when [she] had failed to comply with her prescribed treatment.") (emphasis in original).

Plaintiff did have several asthma attacks that could not be alleviated with medications at home, including episodes on July 5, 2005, May 22, 2006, November 28, 2006, March 3, 2007, and June 10, 2007. Contrary to Plaintiff's assertion, the ALJ thoroughly discussed each of these events. (R. 13-16). Even counting the May 22, 2006 hospitalization as two attacks, however, Plaintiff never had six sufficiently severe attacks within a consecutive 12-month period as required by Listing 3.03B. The ALJ's conclusion in that regard is supported by substantial evidence.

Plaintiff argues that the case must nonetheless be remanded because the ALJ provided a "perfunctory analysis" of Listing 3.03B that consisted of "no more than a sentence." (Doc. 31, at 2). He directs the Court to cases where the ALJ failed to even mention a relevant listing, much less explain why the plaintiff did not meet or equal it. *See Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) ("[T]he ALJ, in addition to not mentioning Listing 1.04A, did not evaluate any of the evidence on its required criteria that is favorable to [the plaintiff]."); *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002) ("[T]he ALJ did not discuss or even reference Listing 112.05 – the section critical to [the plaintiff's] case."); *Steele*, 290 F.3d at 940 ("Although [the plaintiff's] medical records plainly documented his history of seizures, the ALJ altogether failed to discuss, or even cite, listing 11.03.").

18

Here, the ALJ discussed all relevant medical evidence, and explained that Plaintiff's attacks did not occur with the frequency required "under Listing 3.03B." (R. 23). ME Jilhewar reached the same conclusion, and his opinion is not contradicted by any other record evidence. (R. 22, 71). The Court is satisfied that the ALJ built an "accurate and logical bridge" from the evidence to his conclusion that Plaintiff does not meet or equal Listing 3.03B, *Simila*, 573 F.3d at 517, and Plaintiff's request for a remand at step three of the analysis is denied.

### 2. RFC Determination

Plaintiff next argues that the ALJ erred in determining his RFC by (1) failing to properly account for his mental limitations, (2) misstating the level of his impairment in concentration, persistence, or pace, (3) failing to conduct a function-by-function assessment of his abilities as required by SSR 96-8p, and (4) improperly concluding that he is capable of working at all exertional levels without considering the combined effect of his impairments. As discussed below, the Court finds that the RFC determination is supported by substantial evidence.

### a. Mental Limitations

Plaintiff first challenges the ALJ's conclusion that he is limited to "only minimal contact with supervisors, co-workers and the public," arguing that this restriction "do[es] not comport with" either Dr. Prescott's October 2007 finding that he suffers from moderate major depression, or ME Kravitz's testimony that he has a moderate limitation of concentration, persistence, or pace. (Doc. 22, at 6). The Court disagrees. As a preliminary matter, neither Dr. Prescott nor ME Kravitz imposed any specific work restrictions relating to Plaintiff's mental functioning, and Plaintiff fails to indicate what, if any,

additional limitations the ALJ should have incorporated into the RFC.  *See, e.g., Rice*, 384 F.3d at 370 (affirming RFC where "there [wa]s no doctor's opinion contained in the record which indicated greater limitations than those found by the ALJ.").

In addition, Plaintiff's own testimony belies any claim that he requires something more restrictive than minimal interaction with other people.  Plaintiff told Dr. Prescott that he got along well with his children when he saw them, and "got along 'great' with his co-workers." (R. 345).  He also reported in his February 2008 Function Report that he spent "most days" having "meaningful conversations" with people.  (R. 225).  The ALJ found it significant that in that same report, Plaintiff acknowledged that he could handle money and shop, enjoyed reading and writing poetry, traveled around independently, and attended as many as three NA meetings a day.  (R. 25, 221, 224-25).  Moreover, Plaintiff only complained of mental health problems during the two consultative examinations "done in relation to [his] disability claim," and never followed up with treatment at the Auburn Gresham Mental Health Clinic or anywhere else.  (R. 25).  On these facts, the ALJ did not err in restricting Plaintiff to minimal contact with supervisors, co-workers and the public.

### b.      Concentration, Persistence, or Pace

Plaintiff maintains that the RFC is still flawed because the ALJ stated in numbered finding (4) that he has a mild limitation of concentration, persistence, or pace, improperly dismissing both Dr. Kravitz's testimony that Plaintiff is moderately limited in that area, and Dr. Prescott's diagnostic impression of moderate depression and chronic pain.  (R. 24). Defendant concedes the mistake in finding (4) (using the word "mild" instead of "moderate"), but insists that it is nothing more than a harmless typographical error.  (Doc. 30, at 6).  *See Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) ("The doctrine of

20

harmless error indeed is applicable to judicial review of administrative decisions."); *Scott v. Astrue*, 730 F. Supp. 2d 918, 935 (C.D. Ill. July 30, 2010) ("Harmless errors are those that do not affect an ALJ's determination that a claimant is not entitled to benefits.") (internal quotations omitted).

Viewing the ALJ's decision as a whole, the Court agrees with Defendant that any error at step four was harmless. First, at step three of the analysis, the ALJ considered Listing 12.04 for mental impairments and determined that Plaintiff has "moderate difficulties" with concentration, persistence, or pace. (R. 23). In addition, the ALJ cited to Plaintiff's own testimony that he is unable to concentrate, and discussed Dr. Prescott's mental status evaluation in detail. (R. 18-20, 25, 26). More importantly, the ALJ expressly acknowledged – and assigned "great weight" to – ME Kravitz's opinion that if Plaintiff's statements regarding pain, stress and depression were credited, then he would have a moderate impairment of concentration, persistence, or pace. (R. 22, 26). Consistent with this opinion, the ALJ asked the VE about jobs available to a hypothetical person with such a moderate limitation. The VE identified thousands of unskilled hand packer, assembler and hand sorter/machine operator jobs, which are the same positions the ALJ found Plaintiff capable of performing at step five of the analysis. (R. 27, 77).

Plaintiff does not challenge the hypothetical question or the VE's finding, and as noted, no physician imposed any other work-related restrictions based on Plaintiff's mental functioning. On the record presented, the isolated reference to a "mild" limitation in concentration, persistence, or pace does not constitute reversible error given the ALJ's numerous additional references to Plaintiff's moderate limitation in that regard, and his detailed discussion of the evidence supporting this finding.

21

### c.    SSR 96-8p

Plaintiff next objects that the ALJ failed to conduct a function-by-function assessment of his abilities as required by SSR 96-8p. (Doc. 22, at 7-8). The Seventh Circuit has explained that though SSR 96-8p describes the RFC assessment as a function-by-function assessment, "the expression of a claimant's RFC need not be articulated function-by-function; a narrative discussion of a claimant's symptoms and medical source opinions is sufficient." *Knox v. Astrue*, 327 Fed. Appx. 652, 657 (7th Cir. 2009). *See also Gibson v. Astrue*, No. 08 C 3924, 2011 WL 1542088, at *13 (N.D. Ill. Apr. 22, 2011). Here, the ALJ discussed and weighed all of the objective medical evidence in the case, including Plaintiff's treatment records and the opinions from Dr. Prescott, ME Kravitz, Dr. Gong and ME Jilhewar. He also considered Plaintiff's testimony (and credibility) regarding his symptoms, and explained the basis for the RFC determination. (R. 13-22). This more than satisfies the requirements of SSR 96-8p. *See Willis v. Astrue*, Civ. No. 10-207-CJP, 2011 WL 2607042, at *8 (S.D. Ill. July 1, 2011) (ALJ complied with SSR 96-8p where she "provided a lengthy narrative discussion of [the plaintiff's] symptoms, the medical records, the evaluation form completed by [the plaintiff's treating doctor], and the consultative examinations," and "weighed this evidence and explained her assessment of it.").

### d.    Combination of Impairments

Plaintiff finally argues that the ALJ should have found him disabled based on the combined effect of his shortness of breath, constant pain in his back, legs and feet, and depression. (Doc. 31, at 3). There is no question that Plaintiff suffers from asthma, but chest X-rays taken in July 2005, March 2006, May 2006, May 2008, and February 2009

revealed only mild obstructive lung disease, no acute cardiopulmonary disease, and no infiltrates. (R. 24, 275, 461, 473, 497). An October 2007 spirometry report similarly showed only mild obstruction. (R. 21, 339). Several of Plaintiff's ER visits resulted from running out of medication, and though Plaintiff testified that he is "constantly" short of breath, none of his treating or consulting physicians ever imposed any limitations on his activities. (R. 26). In addition, Plaintiff reported that he can prepare meals, do light laundry, go outside, walk and use public transportation by himself, shop for food and clothes, attend NA meetings and engage in "meaningful conversations" notwithstanding his breathing problems. (R. 222-25). The ALJ accounted for Plaintiff's asthma by finding that he needs to avoid even moderate exposure to fumes, odors, dusts, gases, poor ventilation, and extremes of heat and cold, and Plaintiff has not demonstrated that he has any other exertional restrictions related to his breathing.

In discussing Plaintiff's back and leg pain, the ALJ noted that the August 19, 2002 MRI revealed only mild-to-moderate degenerative disc disease with no evidence of spinal or foraminal compromise. (R. 24, 534). An X-ray taken on March 8, 2008 likewise showed only minimal degenerative arthritic changes with no other abnormality. (R. 24, 380-81). The ALJ observed that there is no evidence of disc herniation or nerve impingement, and that records "going back well over a decade only show a few episodes of back pain." (R. 24, 25). The ALJ also stressed that while Plaintiff "alleged and portrayed significant musculoskeletal symptoms during the consultative exams of October of 2007, . . . he did not bother to seek out treatment during this time." (R. 25). Based on this evidence, the ALJ concluded that Plaintiff's back condition does not cause any exertional limitations. (R. 24). Plaintiff's objection that the ALJ "did not articulate his findings regarding other

23

significant functional categories such as lifting, walking, standing and sitting" (*i.e.*, exertional limitations) is without merit.  (Doc. 22, at 8).

Plaintiff attempts to bolster his claim of disability by invoking the term "sciatica" in both of his briefs.  (Doc. 22, at 8; Doc. 31, at 3).  The problem is that there are no records reflecting that any doctor ever diagnosed Plaintiff with that condition, much less imposed any related functional restrictions.  The evidence shows only that (1) Dr. Gong stated that *Plaintiff* described the pain in his right leg as sciatica (R. 336), and (2) Plaintiff routinely complained of what he called sciatica when he went to the emergency room.  (R. 332, 388, 397, 533).  For similar reasons, the Court is not persuaded that Plaintiff's use of a cane for walking is indicative of a disabling condition.  Plaintiff was unable to identify who gave him the cane, and there are no medical records reflecting that a physician advised him to use one.  (R. 67).

Plaintiff makes much of the fact that Dr. Gong described him as having a severely antalgic gait with "some tenderness" in his mid to lower back.  (Doc. 22, at 8; Doc. 31, at 3).  ME Jilhewar did acknowledge that an antalgic gait could evidence a worsening of Plaintiff's condition, but he also testified that Plaintiff's condition could have improved or even resolved.  (R. 72).  Regardless, though Plaintiff was at all times represented by counsel, he failed to produce any medical records reflecting actual deterioration beyond the mild arthritic changes noted in the August 2002 MRI and the March 2008 X-ray.  *See David v. Barnhart*, 446 F. Supp. 2d 860, 871 (N.D. Ill. 2006) ("The claimant's burden of proof includes providing medical evidence to substantiate his assertion of disability.").

Plaintiff next stresses his own testimony that he is in pain at a level of seven to eight out of 10 for 24 hours each day, whether he is sitting, standing or lying down.  (Doc. 31, at

3).  This argument ignores the ALJ's conclusion that Plaintiff's complaints of disabling pain were not fully credible, a finding Plaintiff does not challenge here.  The ALJ observed that Plaintiff admitted to exaggerating his heroin use in order to get into a methadone program, described employment that was never recorded in his earnings statement, and falsely told Dr. Prescott that he suffers from degenerating nerves.  (R. 26).  The ALJ also discussed Plaintiff's activities of daily living, which show that notwithstanding his claims of constant, excruciating pain, he remains able to read, prepare meals, bathe, do light laundry, go outside, shop, write poetry, have meaningful conversations, and attend NA meetings.

Moreover, ME Jilhewar opined that Plaintiff's testimony was inconsistent with the medical evidence, noting for example that during Dr. Gong's examination, Plaintiff complained of decreased sensation in his right leg, but his reflexes were symmetrical and there was no specific musculoskeletal disorder to account for that symptom.  (R. 21, 68-69).  ME Jilhewar stated that if Plaintiff's testimony were not fully credited, then he would have "no specific limitations" due to low back pain.  (R. 70).  As noted, the ALJ did not fully credit Plaintiff's testimony, and Plaintiff does not challenge that determination.  The Court thus finds no error in the ALJ's decision to assign "great weight" to ME Jilhewar's uncontradicted medical opinion.  (R. 26, 70).  *See Browning v. Astrue*, No. 10 C 7129, 2011 WL 5042048, at *5 (N.D. Ill. Oct. 20, 2011) (quoting 20 C.F.R. § 404.1527(f)(2)(i)) (noting that medical experts are "highly qualified physicians and psychologists who are also experts in Social Security disability evaluation."); *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004)) ("The ALJ may properly rely upon the opinion of [state agency] medical experts.").

The Court has already addressed Plaintiff's limitations resulting from his mental impairments, and need not repeat that analysis here. The ALJ's decision demonstrates that he considered all of Plaintiff's relevant physical and mental conditions, and reasonably concluded that taken together, they do not preclude Plaintiff from engaging in substantial gainful activity within the parameters set forth in the RFC. *See Tiemann v. Barnhart*, 152 Fed. Appx. 540, 542 (7th Cir. 2005) (rejecting argument that the ALJ failed to consider the plaintiff's impairments in combination where "he thoroughly accounted for her impairments and adequately explained why he concluded that she was not disabled."). Plaintiff's motion for summary judgment on the grounds that the ALJ made a flawed RFC determination is denied.

## **CONCLUSION**

For the reasons stated above, the Commissioner's Motion for Summary Judgment [Doc. 29] is granted, and Plaintiff's Motion for Summary Judgment [Doc. 19] is denied. The Clerk is directed to enter judgment in favor of Defendant.

ENTER:

Dated: March 14, 2012

*Sheila Finnegan*

SHEILA FINNEGAN
United States Magistrate Judge

26